## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **HENRY TY MCGOWAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:24-cv-00161** |
| | ) | |
| **CITY OF LAVERGNE, TENNESSEE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case arises from Henry Ty McGowan's ("McGowan") termination from the La Vergne Police Department ("LVPD") after he complained about LVPD promotion practices. He brings Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") and Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101, et seq. ("THRA") race discrimination and retaliation claims against the City of Lavergne, Tennessee ("City"). Before the Court is the City's Motion for Summary Judgment (Doc. No. 22), which is ripe for review. (see Doc. Nos. 23, 29, 30–31, 33–34). For the following reasons, the City's Motion (Doc. No. 22) will be granted.

## I.     BACKGROUND AND UNDISPUTED FACTS[1]

McGowan, an African American man, began his employment with the LVPD in 2003. (Doc. No. 30 ¶ 1; Doc. No. 33 ¶ 1). In 2007, McGowan was disciplined following an internal investigation for, among other things, admittedly having sex on duty, being untruthful, and obstructing the LVPD's investigation. (Doc. No. 30 ¶ 2). As a result, he was demoted, suspended,

---

[1] The undisputed facts in this section are drawn from the undisputed portions the responses to the parties' statement of facts (Doc. Nos. 30, 33), the exhibits and depositions submitted in connection with the summary judgment briefing, and portions of the Complaint (Doc. No. 1) that are not contradicted by the evidence in the record.

and warned that he would be dismissed if a similar incident happened again. (Id. ¶ 3). Years after that discipline, in 2021, McGowan was promoted from officer to sergeant. (Id. ¶ 4).

Before the City's elections in November 2022, McGowan "nonchalantly" spoke to Mayor Jason Cole ("Mayor Cole") about concerns he had with LVPD Chief Davis, and his decisions. (Id. ¶ 5). McGowan, in his own words, was "very vague" in his conversation with Mayor Cole, and "didn't provide anything specific" about what his concerns were with Chief Davis's conduct. (Id. ¶ 6).

The next month, Mayor Cole raised unrelated concerns about conduct at the LVPD. (Doc. No. 23-5). Specifically, on December 12, 2022, he reported to Director of Human Resources, Andrew Patton ("Patton"), on the following:

> [H]e had received information from a source (name unknown)[2] reporting that Officer Maegan Hall [("Hall")] was having intimate relationships with other members of the La Vergne Police Department. Specifically[,] with Sergeant Lewis Powell [("Powell")], Officer Patrick Magliocco [("Magliocco")] (including a 3-way with his wife), and Officer Larry Holladay [("Holladay")]. Mayor Cole also mentioned a "girls gone wild" hot tub party at Sergeant Eric Staats house.

(Id. at 1). In response, Patton opened an investigation into the alleged scandal that included investigation ("HR investigation") into the following individuals: Hall, Magliocco, Powell, Holladay, Juan Lugo ("Lugo"), McGowan, Detective Seneca Shields ("Shields"), and Gavin Schoeberl ("Schoeberl"). (Id.). Patton's investigation focused on the following allegations:

---

[2] While not material to the Court's decision, the source of this information is in dispute. On one hand, Powell's report on the investigation states that McGowan eventually became known as the "unknown" source that provided this information to Mayor Cole. (See Doc. No. 23-5 at 1). On the other, McGowan asserts that it was actually Commissioner Davidson that had reported this information to Mayor Cole. (Doc. No. 32-1 at 15:3–9).

2

**Sexual Relationships - unreported**: Hall engaged Magliocco in a sexual relationship that was not reported to leadership (per Employee Handbook 3.3 - page 13).[3]

**Sexual Relationships - unreported**: Hall engaged Powell in a sexual relationship that was not reported to leadership (per Employee Handbook 3.3 - page 13).

**Sexual Relationships - unreported**: Hall engaged Holladay in a sexual relationship that was not reported to leadership (per Employee Handbook 3.3 - page 13).

**Sexual Relationships - unreported**: Hall engaged Lugo in a sexual relationship that was not reported to leadership (per Employee Handbook 3.3 - page 13).

**Sexual Relationships - unreported**: Hall engaged McGowan in a sexual relationship that was not reported to leadership (per Employee Handbook 3.3 - page 13).

**Sexual Relationships - unreported**: Hall engaged Shields in a sexual relationship that was not reported to leadership (per Employee Handbook 3.3 - page 13).

**Sexual Activity on duty**: Hall engaged Powell in sexual acts while on duty and inside city owned property.

**Sexual Activity on duty**: Hall engaged Shields in sexual acts while on duty and inside city owned property.

**Sexual Harassment**: Hall sent explicit photos and videos to multiple co-workers including McGowan, Holladay, Magliocco, Shields, and Schoeberl (per Employee Handbook 9.2 - page 51).

**Sexual Harassment**: Male members sent explicit photos to Hall (per Employee Handbook 9.2 - page 51).

**Workplace Violence**: McGowan came into the HR office and put his hands around the neck of Smith. This act was witnessed by Presley (per Employee Handbook 9.3, - page 51 & 9.8 - page 55).

**Intimidation with intent to interfere with Investigation**: Powell and McGowan conspired to be untruthful during the investigation. (per Employee Handbook 9.7 - page 55).

---

[3] Based on the LVPD Employee Handbook and other investigative materials, the references to "Employee Handbook 3.3" appear to be in error, and should instead say "Employee Handbook 3.4." (<u>See generally</u> Doc. No. 23-5 at 6–10).

3

(Doc. No. 23-5 at 1–2). These allegations implicated possible violations of Sections 3.4, 9.2, 9.3, 9.7, and 9.8 of the LVPD Employee Handbook, which state in relevant part:

**Section 3.4, Personal Relationships:**

If a personal, romantic, or intimate relationship is established between two or more employees post-hire, it is the responsibility and obligation of the employees involved to disclose the existence of the relationship to the (supervisor/ manager/ city administrator/ human resources). When a conflict or potential conflict arises due to the relationship affecting employment, the city reserves the right to make any and all employment decisions in the best interest of the city.

**Section 9.2, Sexual Harassment:**

Sexual harassment, which is harassment directed at an individual because of his or her gender, is one form of harassment prohibited under this policy. The City of La Vergne will not tolerate sexual harassment and prompt action will be taken to investigate and resolve sexual harassment complaints.

Sexual harassment occurs when submission to sexual advances is a condition of employment; when submission to or rejection of sexual advances is the basis of an employment decision; or when the conduct of another based on gender has unreasonably interfered with an affected person's work performance or created an intimidating, hostile, or offensive work environment.

Sexual harassment can be conduct directed toward a man or a woman by either sex and includes the following behavior:

    1. Unwanted physical contact or conduct of any kind, including sexual flirtations, touching, advances or propositions;
    2. Verbal harassment of a sexual nature, such as lewd comments, sexual jokes or references, and offensive personal references;
    3. Demeaning, insulting, intimidating or sexually suggestive comments about or directed to an individual based on his or her gender;
    4. The display in the workplace of demeaning, insulting, intimidating, or sexually suggestive objects, pictures or photographs;
    5. Demeaning insulting, intimidating or sexually suggestive written, recorded or electronically transmitted materials (such as email, instant message, and Internet materials)

Any employee who believes that an individual's actions or words in the workplace constitute unwelcome sexual harassment (or any other form of harassment or discrimination described in this Section) has a responsibility to report the situation as soon as possible.

4

**Section 9.3, Abuse Conduct Prevention Policy:**

The City has enacted this policy pursuant to the guidelines set forth in Tennessee Code Annotated, Section 50-1-503(b), to address and prevent abusive conduct in the workplace.

A.  Statement of Commitment, Values, and Purpose

The City is firmly committed to a workplace free from abusive conduct as defined herein. We strive to provide high quality products and services in an atmosphere of respect, collaboration, openness, safety and equality. All employees have the right to be treated with dignity and respect. All complaints of negative and inappropriate workplace behaviors will be taken seriously and followed through to resolution. Employees who submit complaints pursuant to this policy will not suffer negative consequences for reporting others for inappropriate behavior. This policy applies to all full-time and part-time employees of the company. This policy applies to any sponsored program, event or activity including, but not limited to, sponsored recreation programs and activities and to the performance by officers and employees of their employment related duties. The policy includes electronic communications by any employee.

B. Definition of Abusive Conduct

Abusive conduct includes acts or omissions that would cause a reasonable person, based on the severity, nature, and frequency of the conduct, to believe that an employee was subject to an abusive work environment, which can include but is not limited to

- Repeated verbal abuse in the workplace, including derogatory remarks, insults, and epithets;
- Verbal, nonverbal, or physical conduct of a threatening, intimidating, or humiliating nature in the workplace; or
- The sabotage or undermining of an employee's work performance in the workplace.

A single act generally will not constitute abusive conduct, unless such conduct is determined to be severe and egregious.

Abusive conduct does not include

- Disciplinary procedures in accordance with adopted policies of the company;
- Routine coaching and counseling, including feedback about and correction of work performance;
- Reasonable work assignments, including shift, post, and overtime assignments;
- Individual differences in styles of personal expression;

5

• Passionate, loud expression with no intent to harm others;
• Differences of opinion on work-related concerns; or
• The non-abusive exercise of managerial prerogative.

C.  Employer Responsibility

Supervisors and others in positions of authority have a particular responsibility to ensure that healthy and appropriate behaviors are exhibited at all times and that complaints to the contrary are addressed in a timely manner.

Supervisors will

• provide a working environment as safe as possible by having preventative measures in place and by dealing immediately with threatening or potentially violent situations;
• provide good examples by treating all with courtesy and respect;
• ensure that all employees have access to and are aware of the abusive conduct prevention policy and explain the procedures to be followed if a complaint of inappropriate behavior at work is made;
• be vigilant for signs of inappropriate behaviors at work through observation and information seeking, and take action to resolve the behavior before it escalates; and
• respond promptly, sensitively and confidentially to all situations where abusive behavior is observed or alleged to have occurred.

D.  Employee Responsibility

Employees shall treat all other employees with dignity and respect. No employee shall engage in threatening, violent, intimidating or other abusive conduct or behaviors. Employees are expected to assume personal responsibility to promote fairness and equity in the workplace and report any incidents of abusive conduct in accordance with this policy. You should report all incidents of abusive conduct whether you are the target of such conduct, or whether you observe others engaging in or being subjected to such conduct. Employees should co-operate with preventative measures introduced by supervisors and recognize that a finding of unacceptable behaviors at work will be dealt with through appropriate disciplinary procedures.

**Section 9.7, Obligation of Employees:**

Employees are obligated to report instances of harassment. Employees are also obligated to cooperate in every investigation of harassment. The obligation includes, but is not limited to, coming forward with evidence, both favorable and unfavorable, for a person accused of such conduct; fully and truthfully make written reports or verbally answer questions when required to do so by an investigator. Employees are to refrain from making bad faith accusations of harassment.

6

Disciplinary action may be taken against an employee who fails to report instances of harassment, or who fails or refuses to cooperate in the investigation of a complaint of harassment, or who provides false testimony during the course of an investigation. Employees are prohibited from interfering or attempting to interfere with any departmental investigation. False allegations or statement made during the course of any investigation will be dealt with on a case by case basis, and depending on the outcome, may include disciplinary action.

**Section 9.8, Workplace Violence:**

The City of La Vergne is committed to preventing workplace violence and to maintaining a safe work environment. Employees and customers are to be treated with courtesy and respect at all times. Violence, threats, harassment, intimidation and other disruptive behavior in the workplace will not be tolerated. All weapons, and other dangerous or hazardous devices or substances are prohibited from City of La Vergne property, unless in the control of law enforcement or emergency personnel. City property includes but is not limited to, buildings, parking lots and City owned vehicles. However, licensed firearms owners with carry permits may store weapons secured and out of sight in their locked personal vehicles, in accordance with requirements of State law.

All threats of violence or actual violence, whether direct or indirect, are to be reported immediately to your immediate supervisor or any other member of management and may include law enforcement. This includes threats by employees, as well as threats by customers, vendors, solicitors, or other members of the public. When reporting a threat of violence, the employee should be as specific and detailed as possible. The City of La Vergne will promptly investigate reports of workplace violence including suspicious individuals or activities. Anyone determined to be responsible for threats of or actual violence or other conduct that is in violation of this policy will be subject to prompt disciplinary action up to and including termination.

Employees are encouraged to bring their disputes or differences with other employees to the attention of their supervisors or the Human Resources Department before the situation escalates into potential violence.

(Doc. No. 23-9 at 1–6). The allegations also implicated Rules 2, 10, 11 and 12 of General Order

300.01 of the LVPD, which provide:

**Rule # 2**. _Obedience to Rules, Regulations, Laws._ All personnel of the LaVergne Police Department are required to obey and enforce all:

- Federal, state and local ordinances.
- Rules, regulation and procedures contained in this manual.
- General and Special Orders.

7

- City of LaVergne Personnel Manual Rules and Regulations.
- All lawful orders issued by a superior officer whether written or oral.

Failure to obey or enforce any of the above shall subject that person to disciplinary action.

**Rule #10**.  *Neglect of Duty.*  Gross neglect of duty is any action or omission of action which may be injurious to the member, fellow officers or the general public. A member may be immediately relieved of police responsibility for gross neglect of duty.

**Rule #11**.  *Conduct.* The community expects that the integrity of its police be above reproach. Therefore, Employees of the LaVergne Police Department shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the. Department. Conduct unbecoming an employee shall include any conduct that brings the Department into disrepute, causes the public to lose confidence in the Department, reflects discredit upon the employee as a member of the Department, or impairs the operations, morale or efficiency of the Department or officer to include but not limited to the following:

a. Association with known criminals;
b. By entering or remaining in establishments or residences where illegal activities are suspected or are being committed except as necessary to perform a police activity;
c. By any act of disorderly conduct including, but not limited to, fighting, alcohol consumption resulting in arrest, disturbance of the peace or other action that brings discredit to the member or the Department.

**Rule #12**.  *Truthfulness.* Personnel of the LaVergne Police Department shall speak the truth at all times and under all circumstances, whether under oath or not.

(Id. at 8–9).

To aid his investigation, Patton interviewed the sergeants and officers involved in Mayor Cole's allegations.  (Doc. No. 23-5 at 2–10).  For example, on December 13, 2022, Patton spoke with Powell.  (Id. at 3).  During that interview, he described his knowledge of Hall's relationships with officers and sergeants at LVPD, including her relationship with McGowan.  (Id.).

On December 14, 2022, Patton met with McGowan in his truck away from City Hall.  (Doc. No. 30 ¶ 10).  Patton asked McGowan about his knowledge of Hall's involvement with other officers on second shift.  (Id. ¶ 11).  In response, McGowan discussed various relationships he

8

knew Hall was having with other officers. (See id. ¶¶ 14, 16, 18, 21). He also admitted that Hall had come over to his house on December 4, 2022. (See id.). However, McGowan failed to disclose to Patton all of the information he had about this issue. (See, e.g., id. ¶ 18).

McGowan also discussed with Patton his concerns about Chief Davis that McGowan initially raised with Mayor Cole. (Id. ¶ 24; Doc. No. 33 ¶ 6). McGowan's concerns centered around what he believed to be Chief Davis's unfair promotions and hiring practices. (Doc. No. 30 ¶ 26). Specifically, McGowan believed it problematic that Chief Davis hired one of his fraternity brothers, and that Chief Davis, in McGowan's view, promoted only people that he wanted to promote, such as Harry Hollins ("Hollins"). (Id. ¶¶ 27, 29). Further, McGowan told Patton that he felt Chief Davis was "vindictive" and "hyperemotional." (Id. ¶ 28).

Patton then met with Hall regarding the HR investigation on December 16, 2022. (Doc. No. 23-5 at 8). She confirmed having sexual relationships with members of the LVPD, excluding Powell and McGowan. (Id.). A few days later, Patton interviewed Hall for a second time (Doc. No. 30 ¶ 38), when she admitted to having sex with McGowan on two occasions. (Id. ¶ 39). Hall informed Patton that she asked McGowan whether he disclosed anything about their relationship with HR, to which McGowan responded, "I don't know what you're talking about" and "[t]his discussion didn't happen." (Id. ¶ 42).

The next day, Patton interviewed Powell for a second time. (Id. ¶ 45). During that interview, Powell admitted to having a sexual relationship with Hall, and speaking with McGowan about the HR investigation and their responses to it, despite Patton's instructions to refrain from such conversations.[4] (Id. ¶ 46; Doc. No. 23-5 at 3–4). Powell also told Patton that he had seen

---

[4] Whether Powell instructed officers not to discuss the investigation is disputed by the parties. (See Doc. No. 30 ¶ 32; see also Doc. No. 25-2 at 66:4–11 (Patton testifying that he instructed interviewees not to discuss the investigation during its course)).

Hall's car parked at McGowan's house, and suspected they had been seeing one another. (Doc. No. 30 ¶ 47).

On the same day, Patton then interviewed McGowan for a second time. (Id. ¶ 48). During that interview, McGowan disclosed that he was aware of a relationship between Powell and Hall, because Powell had told him of as much. (Id. ¶ 49). In conflict with Hall's interview, McGowan denied discussing the HR investigation with Hall. (Id. ¶¶ 50–51). He also denied sending Hall an explicit image of himself, which he later admitted being true. (Id. ¶¶ 50–52). Also during the second interview, Patton asked McGowan about an incident that occurred between him and HR employee Bethany Smith ("Smith"), when McGowan placed his hands on Smith from behind and shook her. (Id. ¶¶ 53–54). McGowan admitted this interaction occurred, stating: "I did, I went in here and we[] were playing around . . and I actually, I did that." (Id. ¶ 55).

On December 28, 2022, Patton completed his HR investigation with a 20-page report detailing his findings. (Id. ¶ 58; see Doc. No. 23-5). As relevant here, Patton concluded that he gathered sufficient evidence to substantiate the alleged workplace violation and intimidation with intent to interfere with the investigation allegations by McGowan. (Doc. No. 23-5 at 13). Patton also partially substantiated allegations of unreported sexual relationships, sexual harassment, lying during the investigation, intimidation, and conduct unbecoming of an officer against McGowan. (Doc. No. 30 ¶ 60). Specifically, Patton's report reads:

> Patton **substantiates** the allegation of Sexual Harassment against Hall, Schoeberl, Lugo, Holladay, Shields, and McGowan. Hall admitted to sending nude images to other co-workers. Patton viewed those images and sexual videos personally from McGowan. Hall lied during the course of the investigation by denying sending those images and videos to Sgt. McGowan. Pornography and offensive pictures in the workplace are forms of sexual harassment. These items are offensive, inappropriate, and can lead to a hostile work environment for other employees.
>
> Patton **substantiates** the allegation of Workplace Violence against McGowan. McGowan admitted to coming into the HR office and placing his hands on the neck

10

of Bethany Smith. McGowan claims it was playful however it was unwanted and an aggressive form of physical contact that is not permitted at work. Patton **partially substantiates** the allegations of Sexual Relationships - Unreported, Sexual Harassment, lying during the course of the investigation, intimidation, and conduct unbecoming of an officer against McGowan. While McGowan denied those allegations, behavior was reported and confirmed by Powell and Hall. In addition, Mayor Cole provided information to directly conflict with answers by McGowan during the investigation.

Patton **substantiates** the allegation of Intimidation with intent to interfere with Investigation against McGowan, Powell, and Hall. Confirmation from Powell and Hall showed intention to lying to HR about involvement including sexual activity. McGowan denied this allegation, however the facts show it is more likely than not that it did happen as told.

(Doc. No. 23-5 at 12–13).

As a result, Patton recommended discipline for eight officers and sergeants. (Doc. No. 30 ¶ 62). Specifically, Patton recommended that five of the eight officers and sergeants, including McGowan, Hall, and Powell, be terminated (id. ¶ 63), based on their violations of Sections 3.4, 9.2, 9.3, 9.7, and/or 9.8 of the LVPD Employee Handbook, and Rules 2, 10 and/or 12 of General Order 300.01. (Doc. No. 23-5 at 14–20). All of those officers and sergeants were found to have, among other things: (1) lied during the investigation and (2) had sex on duty. (Id.). Specific as to McGowan, Patton recommended the following:

Patton recommends **Termination of Employment** for **McGowan** based on the violation of sections 3.4, 9.2, 9.3, 9.7, and 9.8 of the Employee Handbook regarding workplace violence, sexual harassment, conduct unbecoming of an officer, and lying during the course of the investigation. McGowan admitted to the workplace violence, while denying all other accusations. The investigation showed more likely than not that McGowan tried to intimidate Hall in denying any allegations against him in this case. McGowan also did meet with Powell, and was not fully truthful with HR about those conversations. McGowan, more likely than not, also had sexual relations with Hall. McGowan also lied during the investigation about sending nude images to Hall, and then, after asking HR to leave the room, confessed to sending the images. Patton found McGowan to be not credible during the course of the investigation. McGowan has previous confirmed allegations of sex with an employee from 2007 in the employment file.

(Id. at 15). Patton also recommended suspensions for the remaining three officers, Magliocco, Holladay, and Schoberl, none of whom Patton found violated Rules 10 and/or 12 of General Order 300.01 given they were not found to have lied during the investigation, or to have had sex on duty. (See id.; see also Doc. No. 32-1 at 69:20–70:24 (Patton testifying that suspended officers were disciplined for not reporting sexual relationships, sexual harassment, or conduct unbecoming an officer)).

Consistent with Patton's recommendations, on January 4, 2023, the City terminated McGowan's employment. (Doc. No. 30 ¶ 67). The City specified the reasons for McGowan's termination, stating: "Employee terminated from employment for policy violations of Employee Handbook 3.4, 9.2, 9.3, 9.7, 9.8, along with General Order 300.01 Rule[s] 2, 11 & 12." (Doc. No. 23-10 at 1). The City also terminated the other four officers that Patton found violated Rules 10 and/or 12 of General Order 300.01. (Doc. No. 30 ¶ 69; see Doc. No. 32-1 at 5–8 (Patton testifying that "[t]he City attorney made the decision that anyone who lied during the course of the investigation or had sex on duty was not going to stay employed.")). Four of the terminated officers are African American or Hispanic, and one is white. (Id. ¶ 70). The City also suspended the three officers that Patton found did not violate Rules 10 and/or 12. (Id. ¶ 71). All three employees who the City suspended are white. (Id. ¶ 72).

## II.     LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "The party bringing the summary

judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (citation and quotations omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. See Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. See Rodgers, 344 F.3d at 595.

## III.    ANALYSIS

The City argues it is entitled to summary judgment on the merits of McGowan's Title VII and THRA race discrimination and retaliation claims. The Court will address each.

### A.    Counts 1 and 2: Title VII and THRA Race Discrimination

McGowan's race discrimination claims under Title VII and the THRA arise from the termination of his employment after the HR investigation. (Doc. No. 23 at 11; see Doc. No. 1 ¶¶ 27–32). Because the Tennessee "legislature intended the THRA to be coextensive with federal

13

law," Phillips v. Interstate Hotels Corp., 974 S.W.2d 680, 683 (Tenn. 1998), such "claims are analyzed in the same manner as claims brought under Title VII of the Civil Rights Act of 1964," Marpaka v. Hefner, 289 S.W.3d 308, 313 (Tenn. Ct. App. 2008) (collecting cases). This includes, where applicable, the McDonnell Douglas v. Green, 411 U.S. 792 (1973) burden-shifting framework that the Tennessee legislature codified for all claims filed after June 10, 2010. Tenn. Code Ann. § 4-21-311 (2011).

Title VII and its Tennessee counterpart prohibit an employer from discriminating against an employee on the basis of race. McDonnell, 411 U.S. at 802–03. Where a plaintiff does not claim to have direct evidence of the race discrimination, like McGowan's case here, the claims are analyzed under the McDonnell Douglas evidentiary framework, which requires that the plaintiff first establish a prima facie case of discrimination. Id. If McGowan can establish a *prima facie* case of race discrimination, the burden shifts to the City to show a legitimate, non-discriminatory reason for McGowan's termination, and then McGowan must establish pretext. See id.

The Court need only address McGowan's *prima facie* case of race discrimination, which is dispositive in resolving the City's motion on Counts I and II. To establish a *prima facie* case of race discrimination, McGowan must demonstrate four things: "(1) he [] was a member of a protected class; (2) he [] suffered an adverse employment action; (3) he [] was qualified for the position; and (4) he [] was replaced by someone outside of the protected class or was treated differently than similarly-situated, non-protected employees." Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006) (citation and quotations omitted). Because the parties dispute only the fourth element of McGowan's prima facie case, the Court focuses there.

14

The center of the parties' dispute revolves around whether McGowan can identify to a similarly-situated, non-protected employee that was treated differently or better.[5]  In evaluating this issue, to be deemed "similarly-situated," "the individuals with whom [McGowan] seeks to compare his[] treatment must have [(1)] dealt with the same supervisor, [(2)] have been subject to the same standards and [(3)] have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).  While this standard "appears to invite a comparison between the employment status of the plaintiff and other employees in every single aspect of their employment, Mitchell has not been so narrowly construed."  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998).  Instead, McGowan need only establish that his former colleagues, outside of his protected class, were treated differently or better shared nearly identical employment situations in all *relevant* aspects.  Id. (citation and quotations omitted).  Because the Mitchell factors are all "relevant to the factual context" of this case—"an allegedly discriminatory disciplinary action resulting in the termination of [McGowan's] employment"—the Court will rely on them here.  Id.

The parties largely focus on Mitchell's third factor that is relevant to establishing the fourth element of McGowan's *prima facie* case.  "In evaluating this factor, [the Court] look[s] to whether the comparators' actions 'were of comparable seriousness to the conduct for which [McGowan] was discharged.'"  Jackson v. VHS Detroit Receiving Hosp., Inc., 814 F.3d 769, 777 (6th Cir. 2016) (quoting Mitchell, 964 F.2d at 583).  In making this showing, McGowan "is not required to show that his proposed comparator's actions were identical to his own."  Colvin v. Veterans

<hr/>

[5] Because there is no argument from the parties, or information in the record, regarding whether McGowan was "replaced by someone outside of the protected class," the Court need not address this method of establishing McGowan's *prima facie* case.  Wright, 455 F.3d at 707.

15

Admin. Med. Ctr., 390 F. App'x 454, 459 (6th Cir. 2010). Still, McGowan cannot create a "reasonable inference of discriminatory motive based on [his] 'employer's more severe treatment of more egregious circumstances.'" Jackson, 814 F.3d at 777 (quoting Clayton v. Meijer, Inc., 281 F.3d 605, 612 (6th Cir. 2002)).

McGowan has not satisfied his burden of production on this issue. As an initial matter, it is not evident from McGowan's briefing who he asserts to be the similarly-situated comparators outside his protected class that the City treated differently than him. (See Doc. No. 29 at 11 (not specifying who his comparators are)). This failure to clearly identify evidence of the third Mitchell factor regarding the fourth element of McGowan's *prima facie* case is alone enough to grant the City's motion on McGowan's race discrimination claims. McDonnell, 411 U.S. at 802–03; see Parsons v. FedEx Corp., 360 F. App'x 652, 646 (6th Cir. 2010) (courts have no duty to "sift through the record in search of evidence to support" a party's position); accord U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1191 (6th Cir. 1997) ("It is well settled that the non-moving party must cite specific portions of the record in opposition to a motion for summary judgment, and that the court is not required to search the record for some piece of evidence which might stave off summary judgment.").

To the extent McGowan relies on the three white officers that were suspended, rather than terminated, following the HR investigation—Magliocco, Holladay, and Schoeberl—as his similarly-situated comparators, that reliance is misguided.[6] (See Doc. No. 33 ¶ 46 (McGowan's statement of facts referring to the different treatment between white police officers who were

---

[6] The City also raises the possibility, based on McGowan's deposition testimony, that Tom Broeker and Curtis Brinkley are McGowan's similarly-situated comparators. (See Doc. No. 23 at 13). Because McGowan does not so much as mention either of these individuals in his briefing, and fails to present any evidence on their employment statuses, the Court need not consider these individuals and whether they are appropriate comparators here. (See Doc. Nos. 29–30, 33).

suspended and McGowan's termination)). As the City correctly points out, none of those officers' actions "were of 'comparable seriousness' to the conduct for which [McGowan] was discharged to establish a *prima facie* case." Jackson, 814 F.3d at 778 (quoting Mitchell, 964 F.2d at 583). Magliocco, Holladay, and Schoeberl were each suspended for some combination of not reporting sexual relationships, sexual harassment, and/or conduct unbecoming an officer. (Doc. No. 32-1 at 69:20–70:24 (Patton testifying that suspended officers were disciplined for not reporting sexual relationships, sexual harassment, or conduct unbecoming an officer)). Not only were those officers and sergeants who were terminated, including McGowan, found to have committed a combination of those infractions, but Patton *also* determined they lied during the investigation and/or had sex on duty. (Doc. No. 33 ¶ 46). In McGowan's case, he did both. (Id.). Further differentiating McGowan's conduct from Magliocco's, Holladay's, and Schoeberl's, the City comes forward with evidence that, of all the officers and sergeants implicated in the HR investigation, McGowan is the only one who: (1) had previously been disciplined for violating LVPD policies; and (2) was found to have committed workplace violence (Doc. No. 23-5 at 15).

Notably, McGowan does not disagree that his misconduct is different from that of his comparators. (Doc. No. 29 at 11). Instead, McGowan asserts that he and his white comparators were all a part of the same investigation based on the same misconduct, and that alone controls the comparator analysis. (See id.). Unfortunately for McGowan, that is not the case, given that the Court must look to the "comparable seriousness" of the conduct for which each employee was disciplined. Mitchell, 964 F.2d at 583. In doing so, and while viewing the facts in McGowan's favor, no reasonable juror could conclude that his conduct—lying during the investigation, having sex on duty, committing workplace violence, and having done so after prior workplace violations—was equal to, or less egregious, than the conduct of Magliocco, Holladay, and

17

Schoeberl, who were disciplined only for lesser offenses.  See Jackson, 814 F.3d at 777; (see Doc. No. 23-5 at 11–20 (Patton explaining that all of the officers and sergeants involved in the investigation committed sexual harassment, failed to report sexual relationships, and/or participated in conduct unbecoming an officer)).  Further, while not controlling here, another critical difference separates McGowan from the white officers he offers as comparators: McGowan was the only one of them in a supervisory position at the time of their discipline.  See Boughton v. Garland, 2022 WL 912210, at *10 (S.D. Ohio Mar. 29, 2022) (relying on Mitchell, finding plaintiff could not point to subordinates as comparators, given his "supervisory position is a reasonable ground on which [the defendant] may have distinguished his response" to plaintiff's wrongdoing).  Given the distinctions between McGowan and his comparators, he cannot create a reasonable inference that the City's decision to terminate him but only suspend lower-ranking white officers who committed less egregious workplace violations, was rooted in discriminatory intent.  See id.; see also Berry v. City of Pontiac, 269 F. App'x 545, 549 (6th Cir. 2008) (affirming grant of summary judgment in defendant's favor where defendant gave plaintiff a more harsh suspension for more egregious conduct than his colleagues engaged in).

Because McGowan has failed to establish the third Mitchell factor that informs the fourth element of his *prima facie* case, the Court need not reach the remaining elements of the McDonnell Douglas framework.  Summary judgment will be granted in the City's favor on Counts I and II.

### B.  Count 3: Title VII and THRA Retaliation

The City next moves for summary judgment on McGowan's Title VII and THRA retaliation claims, which allege that the City retaliated against McGowan by terminating him after he made complaints regarding the promotion of another employee.  (Doc. No. 1 ¶¶ 33–38).  Both McGowan's federal and state "[c]laims asserting retaliation based on circumstantial evidence," as McGowan raises here, "are analyzed under the McDonnell Douglas burden-shifting framework."

18

Briggs v. University of Cincinnati, 11 F.4th 498, 514 (6th Cir. 2021) (applying this framework to Title VII and EPA retaliation claims); see Tenn. Code Ann. § 4-21-311 (2011).

Like McGowan's race discrimination claims, analysis of the prima facie case of his retaliation claims is controlling here. "To establish a *prima facie* case of retaliation under Title VII [and the THRA], [McGowan] must demonstrate that: '(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to [McGowan]; and (4) a causal connection existed between the protected activity and the materially adverse action." Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014) (quoting Jones v. Johanns, 264 F. App'x 463, 466 (6th Cir. 2007)). The City asserts it is entitled to summary judgment on McGowan's retaliation claims because he cannot establish the first or second elements of his *prima facie* case. (Doc. No. 23 at 22–25). Because the parties' dispute on the first element is conclusive, the Court turns there.

For McGowan to establish the first element of his *prima facie* case, that he engaged in protected activity, he must show that he opposed a practice that he "reasonably believe[d] to be a violation of Title VII." Johnson v. University of Cincinnati, 215 F.3d 561, 579 (6th Cir. 2000); see Yazdian v. ConMed Endoscopic Techs., Inc., 793 F.3d 634, 646–47 (6th Cir. 2015) (an employee does not need to be correct that an employment practice he opposes is actually unlawful, but must only reasonably believe it to be so). The "opposing" conduct qualifying for protection by Title VII includes "complaining to anyone (management, union, other employees, or newspapers) about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts by persons other than the employer—e.g., former employers, union, and coworkers." Johnson, 215 F.3d at 579 (citation

omitted); see 42 U.S.C. §2000e-3(a) (protected activity may be shown by either opposing an unlawful practice under Title VII or participating in an investigation, proceeding, or hearing under Title VII). In making such complaints, the opposition must be based on "a reasonable and good faith belief that the opposed practices were unlawful." Johnson, 215 F.3d at 579 (citation and quotations omitted).

Here, McGowan alleges the protected activity supporting his retaliation claim is the complaint he made to Mayor Cole, and then Patton, about Chief Davis's promotion practices. (Doc. No. 1 ¶ 34 ("Defendant heard allegations of a potential problematic promotion and undertook an investigation into the sexual affairs of Meagan Hall and others."); see Doc. No. 29 at 17 ("McGowan was engaging in a protected activity by making a complaint about the promotion practices of the Chief.")). The City asserts that the complaints McGowan raised about Chief Davis's promotion decisions were far too vague to constitute protected activity. Viewing the evidence in the light most favorable to McGowan, the Court agrees with the City.

The evidence before the Court demonstrates that McGowan's conversation with Mayor Cole about Chief Davis's hiring decisions was "very vague" and "didn't provide anything specific" about those practices. (Doc. No. 30 ¶ 6). Later, when speaking with Patton, McGowan expressed concerns that Chief Davis was hiring one of his fraternity brothers; only promoted those he liked; and was "vindictive" and "hyperemotional." (Id. ¶ 28). McGowan's Equal Employment Opportunity Commission Charge provides little more on this, as it states only that he "was dealing with an issue related to the proposed promotion of another officer" that he "did not believe was a good idea[.]" (Doc. No. 23-12 at 2).

From these facts, and McGowan's briefing that offers no further explanation (see Doc. No. 29 at 17), it is unclear to the Court what unlawful practice McGowan asserts he contends Chief

Davis had engaged in. While McGowan need not lodge a complaint with "absolute formality, clarity, or precision," he must make a precise allegation about unlawful discrimination rather than merely expressing concern about "management practices." Yazdian, 793 F.3d at 645; see Caldwell v. Gasper, 2022 WL 16629161, at *7 (6th Cir. Nov. 1, 2022) (relying on Yazdian, stating the same). But, even viewing the evidence in McGowan's favor, that is exactly what he did here. McGowan's complaints about Chief Davis's hiring and promotion practices "did not complain about unlawful activity by [Chief Davis], but rather, about management practices" that McGowan disagreed with. Id. Without McGowan complaining more specifically about what Chief Davis was doing that McGowan reasonably believed to be a violation of federal and state law, McGowan's complaints to Mayor Cole and Patton are otherwise unprotected. See id. (finding the same where sergeant complained about discipline imposed post-investigation).

Even if the Court assumes that McGowan intended to oppose discrimination or unequal treatment of some sort—an assumption the Court must make with evidence in the record only to the contrary—the result is the same. (See, e.g., Doc. No. 25-1 at 343:3–22 (McGowan admitting that he has not described the events at issue as discriminatory)). Viewing McGowan's complaints through this lens, such a vague complaint of discrimination or unfair treatment asserted by McGowan here is still "insufficient to constitute opposition to an unlawful employment practice" because the record remains devoid of what McGowan believed constituted illegal discrimination or illegal unfair treatment. Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th Cir. 1989); see Caldwell, 2022 WL 16629161, at *7 (same); see also Wiloughby v. Allstate Ins. Co., 104 F. App'x 528, 530–31 (6th Cir. 2004) (affirming district court's grant of summary judgment for defendant because plaintiff's letter including vague charge of unequal treatment was not protected activity). Indeed, if McGowan's admittedly vague statements to Mayor Cole and

Patton could constitute protected activity, "every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination[,]" which "would constitute an intolerable intrusion into the workplace." Booker, 879 F.2d at 1313.

At bottom, McGowan has failed to demonstrate that he actually believed that the "conduct complained of constituted a violation of relevant law," or that "a reasonable person in the same factual circumstances" would "believe that the conduct complained of was unlawful." Yazdian, 793 F.3d at 646–47 (internal quotations and citation omitted). Because McGowan has not presented any evidence from which a reasonable juror could conclude that he engaged in protected activity, the Court will grant summary judgment in the City's favor on Count III.[7]

## IV. CONCLUSION

For the foregoing reasons, the City's Motion for Summary Judgment (Doc. No. 22) will be granted.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

---

[7] Given this outcome, the Court need not address the City's argument that McGowan's THRA race discrimination and retaliation claims are barred by the statute of limitations. (See Doc. No. 23 at 25). In any event, the Court notes that McGowan apparently finds this argument meritorious, given his lack of response on the matter. (See generally Doc. No. 29); see also See Humphrey v. United States Att'y Gen.'s Office, 279 F. App'x 328, 331 (6th Cir. 2008) (where plaintiff fails to respond to an argument in its response, any opposition is waived).

22